1

2

3

4

5

6

7

8                         IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DEAVON E. TORRENCE,

11             Plaintiff,                    No. 2:10-cv-1222 KJM KJN P

12       vs.

13   F. HSUEH, et al.,

14             Defendants.            FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17             Plaintiff, a state prisoner proceeding without counsel, seeks relief pursuant to

18   42 U.S.C. § 1983.  This case is proceeding on the first amended complaint, filed September 22,

19   2010.  Plaintiff alleges that defendants Saukhla, Andreasen, McKenzie, Grannis, Walker, Haile,

20   Bick and Hsueh[1] were deliberately indifferent to plaintiff's serious medical needs by allegedly

21   failing to timely diagnose and appropriately treat plaintiff's March 12, 2008 severe head, neck,

22   and spinal injuries.  On June 22, 2012, defendants filed a motion for summary judgment.  As

23   explained below, the court recommends that defendants' motion for summary judgment be

24   granted.

25   _____

26        [1]  The court dismissed defendant Champion on December 30, 2011.  (Dkt. No. 72.)

                                              1

II.  Plaintiff's Allegations

Plaintiff is proceeding on the verified amended complaint filed September 22, 2010.  (Dkt. No. 10.)  Plaintiff alleges that on March 12, 2008, plaintiff suffered a severe head, neck, and spinal injury totally paralyzing him in all four extremities, and that defendants displayed deliberate indifference to plaintiff's complaints, treating him only with Ibuprofen. Plaintiff claims it took over one year to diagnose plaintiff with a broken neck.

Specifically, plaintiff contends defendants Dr. Hsueh, Dr. Saukhla, and Haile were deliberately indifferent to plaintiff's serious medical needs in treating plaintiff's neck and spinal injury, and that Dr. Saukhla was deliberately indifferent in treating plaintiff's ankle injury, which plaintiff claims occurred as a result of his spinal injury.  Plaintiff also argues that defendants Dr. Andreasen, McKenzie, Dr. Bick, Walker and N. Grannis were deliberately indifferent to plaintiff's serious medical needs, and violated his due process rights, based on their role in addressing plaintiff's administrative appeals.

III.  Defendants' Motion for Summary Judgment

On June 22, 2012, defendants moved for summary judgment on the grounds that there are no genuine issues of material facts, that plaintiff failed to adduce competent evidence in support of his claims, and that defendants are entitled to qualified immunity; thus, defendants contend they are entitled to judgment as a matter of law.  (Dkt. No. 80.)  Plaintiff did not file a timely opposition.  On July 19, 2012, plaintiff was advised of the requirements for filing an opposition to a motion for summary judgment under Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998), and granted an additional thirty days in which to file an opposition.  (Dkt. No. 86.) On August 23, 2012, plaintiff filed an opposition and a declaration with exhibits.  (Dkt. No. 92.) Defendants filed a timely reply.  (Dkt. No. 93.)  On September 24, 2012, plaintiff filed a reply to defendants' objections to plaintiff's responses to defendants' statement of undisputed facts. (Dkt. No. 94.)  While this reply is technically a sur-reply for which plaintiff did not seek leave of court to file, the court has considered plaintiff's filing.

1        A.  Legal Standard for Summary Judgment

2            Summary judgment is appropriate when it is demonstrated that the standard set

3  forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if

4  the movant shows that there is no genuine dispute as to any material fact and the movant is

5  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[2]

6            Under summary judgment practice, the moving party always bears
             the initial responsibility of informing the district court of the basis
7            for its motion, and identifying those portions of "the pleadings,
             depositions, answers to interrogatories, and admissions on file,
8            together with the affidavits, if any," which it believes demonstrate
             the absence of a genuine issue of material fact.

9

10  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

11  56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

12  only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

13  Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

14  387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

15  Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

16  burden of production may rely on a showing that a party who does have the trial burden cannot

17  produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

18  should be entered, after adequate time for discovery and upon motion, against a party who fails to

19  make a showing sufficient to establish the existence of an element essential to that party's case,

20  and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

21  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

22  necessarily renders all other facts immaterial."  Id. at 323.

23  ////

24

---

25        [2]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10,
    2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule
26  56, "[t]he standard for granting summary judgment remains unchanged."

1    Consequently, if the moving party meets its initial responsibility, the burden then

2  shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.

3  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

4  to establish the existence of such a factual dispute, the opposing party may not rely upon the

5  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

6  form of affidavits, and/or admissible discovery material in support of its contention that such a

7  dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

8  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

9  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

10  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

11  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

12  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

13  1436 (9th Cir. 1987).

14    In the endeavor to establish the existence of a factual dispute, the opposing party

15  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

16  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

17  versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

18  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

19  genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

20  committee's note on 1963 amendments).

21    In resolving a summary judgment motion, the court examines the pleadings,

22  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

23  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

24  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

25  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

26  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

4

1    produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

2    Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

3    1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

4    show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

5    as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

6    'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

7            By orders filed November 10, 2010, and July 19, 2012, the court advised plaintiff

8    of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of

9    Civil Procedure.  (Dkt. Nos. 11, 86); see Rand, 154 F.3d at 957.

10            B.  Undisputed Facts

11            For purposes of the instant motion for summary judgment, the court finds the

12   following facts undisputed, unless otherwise noted.

13            1.  At all times relevant to this lawsuit, plaintiff Deavon E. Torrence was a

14   prisoner properly in the custody and control of the California Department of Corrections and

15   Rehabilitation ("CDCR") at California Medical Facility ("CMF") in Vacaville, California.

16            2.  Plaintiff is not a doctor, has no medical training, has never worked in the

17   medical field, and has no expertise in the field of medicine.

18            3.  In 1987 or 1988, prior to being incarcerated, plaintiff was involved in a motor

19   vehicle accident causing him whiplash and back pain.  (Pl.'s Depo. at 21-22.)

20            4.  Dr. Hsueh has been a licensed physician and surgeon in the State of California

21   since 1997 and is board certified in internal medicine.

22            5.  Dr. Hsueh is a contract physician with the CDCR at CMF.

23            6.  On March 12, 2008, Dr. Hsueh examined plaintiff in the B-1 Emergency Room

24   because plaintiff had collided with another inmate while playing basketball, had hit another

25   ////

26   ////

1    inmate's chest, and had fallen backward, hitting the ground.[3]  (Hsueh Decl. ¶ 3 & Ex. A.)

2           7.  Plaintiff indicated that he had not lost consciousness or had visual

3    disturbances.[4]

4           8.  Plaintiff stated he had had shortness of breath ("got the wind knocked out") but

5    at the present time did not have shortness of breath or chest pain.[5]  (Hsueh Decl. ¶ 3 & Ex. A.)

6           9.  Plaintiff complained only of pain at the back of his head ("occipit") but with

7    no nausea/vomiting, no focal weakness and no neck pain other than from a neck brace which was

8    in place at the time Hsueh examined him.[6]  (Hsueh Decl. ¶ 3 & Ex. A.)

9           10.  Plaintiff did complain of numbness/tingling in his fingertips and toes, but this

10   was improving.[7]  (Hsueh Decl. ¶ 3 & Ex. A.)

11          11.  Plaintiff did not present with bowel or bladder dysfunction, a common

12   symptom of injuries to the spinal cord.

13          12.  During Dr. Hsueh's examination of plaintiff, Dr. Hsueh noted that plaintiff

14   was in no apparent medical distress, and his vital signs had been checked and were normal.[8]

15

16          [3]  Plaintiff contends that he fractured his C-spine, and was paralyzed from his neck to his
     feet.  (Dkt. No. 92 at 2.)  However, plaintiff does not provide medical evidence demonstrating
17   that he fractured his C-spine on March 12, 2008, or that he was diagnosed with paralysis from the
     neck down by a medical professional.
18
            [4]  Plaintiff claims that he told Dr. Hsueh that "everything got to going in slow motion, and
19   then [he] fell backward."  (Dkt. No. 92 at 2.)

20          [5]  Plaintiff claims that he did not tell Dr. Hsueh that "he got the wind knocked out," but
     that he said it feels like something is pressing down on his organs and it's making it hard for him
21   to breathe.  (Dkt. No. 92 at 2.)

22          [6]  Plaintiff claims that his complaints of neck pain were not from the neck brace because
     the pain continued once the neck brace was removed.  (Dkt. No. 92 at 2-3.)
23
            [7]  Plaintiff claims that the numbness was not improving; rather, the only thing that was
24   improving was that he was beginning to be able to move his limbs.  (Dkt. No. 92 at 2-3.)

25          [8]  Plaintiff claims that he was mentally distressed at the thought of being totally paralyzed,
     having a broken neck, and because of numbness and swelling that caused labored breathing, head
26   injury, etc.  (Dkt. No. 92 at 3.)

(Hsueh Decl. ¶ 4 & Ex. A.)

13. Plaintiff's head was normal in shape and showed no signs of trauma.

14. There was a small soft tissue swelling over the occipit and plaintiff was mildly tender to palpation there, but Dr. Hsueh felt no defect on plaintiff's scalp.

15. Dr. Hsueh also performed examinations of plaintiff's neck and extremities.

16. Plaintiff's neck was not tender to palpation and there was no spine step off. This means there was no misalignment of the bones of the cervical spine.[9]  (Hsueh Decl. ¶ 5.)

17. Dr. Hsueh was unable to check plaintiff's neck range of motion because of the presence of the neck brace.[10]  (Hsueh Decl. ¶ 5 & Ex. A.)

18. Dr. Hsueh's examination of plaintiff's extremities revealed no clubbing (enlargement of the ends of the fingers and toes), no cyanosis (blue color), and no edema (swelling).[11]  (Hsueh Decl. ¶ 5 & Ex. A.)

19. With the assistance of Dr. Capozzoli, a board certified Neurologist, Dr. Hsueh also performed a neurological examination of plaintiff.

20. Plaintiff was alert and oriented and his pupils were equal, round and reactive to light.

21. Plaintiff's extraocular muscles were intact and he exhibited no facial asymmetry/dysarthria.

22. Facial asymmetry results from damage to Cranial Nerve VII, the facial nerve.

23. Dysarthria is a motor speech disorder resulting from neurological injury to the

[9] Plaintiff claims that his neck was, and still is, tender to the slightest touch.  (Dkt. No. 92 at 3.)

[10] Plaintiff claims that Dr. Hsueh could have checked plaintiff's range of motion when the brace was loosened before Dr. Hsueh checked plaintiff's extremities, or when plaintiff did not have the brace on, i.e. when Dr. Hsueh checked plaintiff's reflexes, when plaintiff went for the x-ray, or when plaintiff was released to his cell without the neck brace.  (Dkt. No. 92 at 3.)

[11] Plaintiff contends that there was swelling and that the swelling was making it hard to breathe.  (Dkt. No. 92 at 4.)

1    motor component of the speech system and is characterized by poor articulation of sounds.

2          24.   Cranial Nerves II-XII were normal.

3          25.   While plaintiff's muscle strength was normal, his sensation to light touch on

4    his fingers was diminished.

5          26.   Also, Dr. Hsueh's examination revealed that plaintiff subjectively believed he

6    had decreased sensation over his right thigh, right shin area, and toes.[12]  (Hsueh Decl. ¶ 6 & Ex.

7    A.)

8          27.   Deep tendon reflexes were, however, symmetric and there was no sign of

9    clonus.  Clonus is a series of involuntary muscle contractions and relaxations and is a sign of

10   motor neuron lesions such as spinal cord damage.

11         28.   Plaintiff did not present with ataxia, which is better known as clumsiness and

12   is a neurological sign and symptom consisting of gross lack of coordination.

13         29.   Dr. Hsueh also ordered x-rays of plaintiff's cervical spine on March 12, 2008.

14   These x-rays showed no fractures or subluxation.

15         30.   Dr. Hsueh assessed plaintiff as having occipital pain and peripheral numbness

16   (legs, toes, fingers).

17         31.   Dr. Hsueh repeated the sensation to light touch/pinprick and vibration exams

18   on plaintiff and the results were normal.[13]  (Hsueh Decl. ¶ 8 & Ex. A.)

19         32.   After (a) completing a full assessment of plaintiff's medical condition and

20   symptoms, (b) performing a full neurological examination with the assistance of Dr. Capozzoli,

21   and (c) reviewing the x-rays with Dr. Capozzoli, Dr. Hsueh diagnosed plaintiff with a spinal

22

23          [12]  Plaintiff disputes this fact claiming that the decreased sensation was not just in his
24   mind.  (Dkt. No. 92 at 4.)  However, Dr. Hsueh's medical record acknowledges plaintiff's
     complaints, and this fact is deemed undisputed.

25          [13]  Plaintiff claims the results were not normal because plaintiff had no feeling in his right
     side.  (Dkt. No. 92 at 4.)  However, plaintiff submits no medical evidence in support of this
26   claim.  This fact is deemed undisputed.

1   contusion.[14]   (Hsueh Decl. ¶ 9 & Ex. A.)

2          33.  A spinal contusion is one of the most common types of spinal cord injury.

3   The spinal cord is bruised but not severed and results in temporary (usually one to two day)

4   neurologic deficits, and the patient fully recovers without structural damage.[15]   (Hsueh Decl. ¶ 9.)

5          34.  Dr. Hsueh told plaintiff, with the assistance of Dr. Capozzoli, to expect

6   resolution of the numbness in one day.[16]   (Hsueh Decl. ¶ 10 & Ex. A.)

7          35.  Dr. Hsueh's plan was to treat plaintiff with Motrin as needed for his pain.

8          36.  Plaintiff was scheduled to follow-up in the Urgent Care Clinic (UCC) in one

9   day and was told to return to the clinic/ER if he experienced an increase in numbness or

10  weakness.

11         37.  Plaintiff acknowledged his awareness of the instructions upon discharge back

12  to his housing unit.[17]   (Hsueh Decl. ¶ 10 & Ex. A.)

13         38.  Dr. Hsueh wrote an order for Motrin, 600 mg tablets, taken by mouth twice a

14  day for 10 days for plaintiff, and an order for an urgent care clinic follow-up in one day.

15         39.  Plaintiff was also given Motrin during Dr. Hsueh's examination of him.

16         40.  Dr. Saukhla has been a licensed physician and surgeon in the State of

17  California since 1998 and is board certified in internal medicine.

18

19   _____

      [14]  Plaintiff claims there was no full assessment because he was not assessed or warned of
20   the possibility of a fractured/broken neck, and the neurological exam was not complete because
     there was no test or exam concerning nerve damage.  (Dkt. No. 92 at 5.)  However, plaintiff
21   adduced no medical evidence demonstrating that he fractured his C-spine on March 12, 2008, or
     that the assessment was objectively unreasonable or medically unsound.  This fact is deemed
22   undisputed.

23         [15]  Plaintiff's objection to this medical professional's definition of a medical term is not
     relevant, and this fact is deemed undisputed.

24         [16]  Plaintiff does not dispute this fact, but simply adds that his numbness did not resolve
     in one day.  This fact is deemed undisputed.
25

26         [17]  Plaintiff clarifies that he was told to come back to B-4 ER if his symptoms got worse.
     (Dkt. No. 92 at 5.)

1    41.  Dr. Saukhla has been employed by the CDCR at CMF since February 1999 as

2  a physician and surgeon.

3    42.  On the night of March 12, 2008, plaintiff returned to the B-1 Emergency

4  Room (ER) with complaints of worsening numbness symptoms and was evaluated by Dr. Steven

5  Mo.

6    43.  During his examination of plaintiff's upper extremities, Dr. Mo noted normal

7  range of motion and strength and that plaintiff had subjective numbness in his palms and

8  fingertips.[18]  (Saukhla Decl. ¶ 4 & Ex. A.)

9    44.  During his examination of plaintiff's lower extremities, Dr. Mo noted that

10  plaintiff had subjective numbness, right greater than left.  (Saukhla Decl. ¶ 4 & Ex. A.)

11    45.  Dr. Mo also noted that deep tendon reflexes were slightly decreased

12  throughout, but that plaintiff's motor function was within normal limits.

13    46.  Dr. Mo assessed plaintiff with a cervical compression injury, and transferred

14  plaintiff to the Emergency Room at Doctors Medical Center San Pablo.

15    47.  In the early morning hours of March 13, 2008, plaintiff was evaluated at

16  Doctor's Medical Center San Pablo.

17    48.  A computed tomography (CT) scan was taken of plaintiff's cervical spine.

18    49.  The CT scan showed no acute fractures.

19    50.  Plaintiff was discharged with Motrin and a diagnosis of neck pain.

20    51.  Plaintiff arrived back at CMF a little after 4:00 a.m. on March 13, 2008, and

21  Dr. Mo noted that plaintiff received a CT scan at Doctors Medical Center, which was negative,

22  and that he had a triage appointment upcoming per Hsueh's March 12, 2008 order.

23

24

_____

25    [18]  Plaintiff disputes this fact and the next fact, claiming that the numbness was not just in
his mind.  (Dkt. No. 92 at 6.)  However, Dr. Saukhla's medical record acknowledges plaintiff's
26  complaints, and facts 44 and 45 are deemed undisputed.

1    52.  At approximately 8:30 a.m., Dr. Mo wrote an order for Ibuprofen[19] for

2    plaintiff for his pain.

3    53.  At approximately 10:30 a.m. on March 13, 2008, plaintiff had a follow up

4    appointment with Physician Assistant Warhover.

5    54.  Plaintiff complained of head pain but no nausea, vomiting or vision changes.

6    55.  Plaintiff reported tingling in his upper and lower extremities.

7    56.  Warhover noted that plaintiff had a negative CT scan at Doctors Medical

8    Center, and that plaintiff had no bowel or bladder issues.

9    57.  During the examination, Warhover noted that plaintiff's upper and lower

10   extremities strength was 5 out of 5, the neurological exam was normal, and plaintiff's cranial

11   nerves were grossly intact.

12   58.  Warhover assessed plaintiff with numbness/tingling in his upper and lower

13   extremities, and told him to expect that this condition would continue to improve as the

14   inflamation decreased.

15   59.  Warhover also discussed the examination with Dr. DiTomas, the Chief

16   Physician and Surgeon, who noted that plaintiff had a normal neck CT with no headaches, no

17   nausea or vomiting, and no vision changes.  (Saukhla Decl. ¶ 7 & Ex. D.)

18   60.  Dr. DiTomas noted that plaintiff's cranial nerves were fully intact and that he

19   had been seen by the neurologist (Dr. Capozzoli) the day before.  (Saukhla Decl. ¶ 7 & Ex. D.)

20   61.  DiTomas felt that the diagnosis was compatible with spinal contusion.

21   62.  Dr. DiTomas noted that plaintiff had no increase of symptoms since the day

22   before, and in fact had shown some improvement.  (Saukhla Decl. ¶ 7 & Ex. D.)

23   63.  Warhover wrote an order for Ibuprofen 600 mg, by mouth three times a day

24

25   [19]  Ibuprofen is defined as a "nonsteroidal analgesic and anti-inflammatory agent derived
     from propionic acid."  STEDMAN'S MEDICAL DICTIONARY 942 (28th ed. 2006).  Thus, Ibuprofen
26   relieves pain and reduces inflammation.  Ibuprofen is available under the trademark, Motrin.

as needed for pain for two weeks for plaintiff and for plaintiff to follow up with his primary care physician ("PCP") early the following week.

64. Warhover also ordered a Medical Lay-In for plaintiff from March 13 to March 20, 2008.

65. Plaintiff filled out a Health Care Services Request Form dated March 14, 2008, requesting physical therapy ("PT") and a Magnetic Resonance Imaging ("MRI").

66. Plaintiff, however, refused to be seen by the triage nurse.

67. On March 18, 2008, Dr. Saukhla examined plaintiff.

68. Plaintiff stated that he wanted an MRI of his neck and also PT, but that he had already been sent out for a CT scan.

69. Plaintiff stated that his symptoms were decreasing, but that he had tingling in his hands, abdominal wall and legs.[20]   (Saukhla Decl. ¶ 9 & Ex. F.)

70. Dr. Saukhla noted that plaintiff had no weakness, no bladder/bowel incontinence, and that he was able to ambulate very well.[21]   (Saukhla Decl. ¶ 9 & Ex. F.)

71. During Dr. Saukhla's examination, he noted that plaintiff had 5 out of 5 power in his extremities, his deep tendon reflexes were 2 out of 4, and his gait was within normal limits.  (Saukhla Decl. ¶ 9 & Ex. F.)

72. Dr. Saukhla assessed that plaintiff was improving and had no new symptoms, but plaintiff wanted further imaging.  (Saukhla Decl. ¶ 9 & Ex. F.)

73. Dr. Saukhla's plan was to continue plaintiff's current medications but there was no reason or medical indication for physical therapy at that time, and that plaintiff should avoid physical therapy at that time.

---

[20]  Plaintiff now claims that he never stated his symptoms were decreasing.  (Dkt. No. 92 at 7.)

[21]  Although plaintiff disputes the use of the term "ambulate," he concedes he could walk on his own.  This fact is deemed undisputed.

1      74.  Dr. Saukhla wrote an order for an MRI of plaintiff's cervical spine[22] and for

2  plaintiff to follow-up in two weeks.

3      75.  On March 25, 2008, Dr. Saukhla had a follow-up appointment with plaintiff

4  regarding his HIV.

5      76.  Dr. Saukhla noted that the tingling in plaintiff's extremities had decreased,

6  that his strength was good, and that he had no bladder or bowel incontinence.

7      77.  Plaintiff stated that he was taking his medications and suffering no side

8  effects.

9      78.  Dr. Saukhla's examination of plaintiff's extremities revealed no clubbing,

10  cyanosis or edema.   (Saukhla Decl. ¶ 10 & Ex. G.)

11      79.  Dr. Saukhla noted that plaintiff was awaiting the MRI of his cervical spine

12  which Dr. Saukhla had ordered for him on March 18, 2008, but that plaintiff was improving.

13      80.  Plaintiff filled out a Health Care Services Request Form dated March 26,

14  2008, regarding a sore ankle, knee, and possible damage.

15      81.  Plaintiff was evaluated by the triage nurse on March 27, 2008.

16      82.  On April 14, 2008, Dr. Saukhla examined plaintiff because he had complaints

17  related to a sprain of his right ankle two weeks before.[23]  (Saukhla Decl. ¶ 12 & Ex. I.)

18      83.  Plaintiff had not come in on the day he sustained the ankle injury for an

19  evaluation either in the B1 clinic or urgent care clinic.

20      84.  Dr. Saukhla noted no swelling or redness, that the pain had decreased, and

21

22    [22]  In the March 18, 2008 medical record, Dr. Saukhla wrote:  "will order MRI . . . for patient's comfort.  The patient very anxious about it.  Despite my explanation he is worried."  (Dkt. No. 92-1 at 15.)

23

24    [23]  Plaintiff now claims he did not complain of an ankle sprain, but of "damage done due to slipping on the ladder while trying to climb on my bunk without any feeling in [his] hands and feet."  (Dkt. No. 92 at 8.)  However, plaintiff did not relate this source of injury on the March 26, 2008 Health Care Services Request Form, which is completed by the patient.  (Dkt. No. 82-1 at 27.)  Moreover, later x-rays demonstrated that plaintiff's ankle was not broken, so fact no. 82, as written, without reference to the source of injury, is undisputed.

25

26

1  plaintiff was able to walk well.[24]  (Saukhla Decl. ¶ 12 & Ex. I.)

2  85.  Dr. Saukhla also noted that plaintiff did not mention anything about his

3  neck.[25]  (Id.)

4  86.  Dr. Saukhla's examination of plaintiff's right ankle revealed no swelling, no

5  redness, no pain, and plaintiff had full range of motion.[26]  (Id.)

6  87.  Dr. Saukhla assessed plaintiff with a right ankle sprain with a negative exam.

7  88.  Plaintiff was very concerned about a tendon/ligament rupture or an ankle

8  fracture despite Dr. Saukhla's reassurance.

9  89.  Dr. Saukhla did order an x-ray of plaintiff's right ankle, and Dr. Saukhla

10  noted that plaintiff was still awaiting the MRI of his neck.

11  90.  On April 22, 2008, plaintiff had x-rays taken of his right ankle which Dr.

12  Saukhla had ordered on April 14, 2008.

13  91.  The x-rays showed no acute osseous abnormality, which meant there was no

14  problem with plaintiff's ankle bone.

15  92.  On May 5, 2008, plaintiff had the MRI of his cervical spine which Dr.

16  Saukhla had ordered on March 18, 2008.

17  93.  The findings showed that the gross alignment of the cervical spine was within

18  normal limits and the vertebral bodies were uniform in height without fracture.

19  94.  The impression of the Radiologist, Dr. Schultz, was a C2 cervical cord lesion.

20  ////

21  ////

22

23  [24]  Plaintiff now claims that his foot was discolored and swollen, and that he walked with a limp.  (Dkt. No. 92 at 8.)

24  [25]  Plaintiff claims that he was required to restrict his complaints to those set forth in the sick call request.  (Dkt. No. 92 at 8.)

25

26  [26]  Plaintiff now claims that his right foot was swollen and discolored, and that he was in pain.  (Dkt. No. 92 at 8.)

95.  The differential diagnoses[27] included contusion, demyelinization,[28] a possible infarct,[29] and less likely, a tumor.

96.  Post gadolinium sequences were recommended for further characterization.

97.  Dr. Haile has been a licensed physician in the State of California since 2002 and is board certified in internal medicine.

98.  Dr. Haile has been employed by the CDCR at CMF as a physician and surgeon since 2002.

99.  Dr. Haile was plaintiff's PCP beginning June 2008 until plaintiff transferred to California Men's Colony in February 2011.

100.  Plaintiff submitted a Health Care Service Request Form dated June 1, 2008.

101.  Plaintiff requested to talk about his MRI and x-ray results, and he complained of swelling in his right foot and leg, abdomen and back and of pain in his ankle, neck, head and shoulder.

102.  On June 1, 2008, plaintiff was assessed by the triage registered nurse who noted that plaintiff was able to walk, had a stable gait, no pain/tenderness, and no swelling was noted on his legs, abdomen or upper extremities.[30]  (Haile Decl. ¶ 4 & Ex. A.)

---

[27]  The terms "differential diagnosis" are defined as "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." STEDMAN'S MEDICAL DICTIONARY 531 (28th ed. 2006).

[28]  The terms "demyelinization" or "demyelination" are defined as the "loss of myelin with preservation of the axons or fiber tracts.  Central demyelination occurs within the central nervous system (e.g., the demyelination seen with multiple sclerosis); peripheral demyelination affects the peripheral nervous system (e.g., the demyelination seen with Guillain-Barre syndrome)." STEDMAN'S MEDICAL DICTIONARY 509 (28th ed. 2006).

[29]  The term "infarct" is defined as "an area of necrosis resulting from a sudden insufficiency of arterial or venous blood supply." STEDMAN'S MEDICAL DICTIONARY 968 (28th ed. 2006).

[30]  Plaintiff now claims, without citing to evidentiary support, that he was "constantly in pain," had a "continuous off and on swelling," and walked with a limp, sometimes worse than at other times.  (Dkt. No. 92 at 10.)

103.  The triage registered nurse's plan was to refer plaintiff to his PCP on June 5, 2008.

104.  Dr. Haile examined plaintiff on June 5, 2008.

105.  Plaintiff said that he received an MRI and would like the results.

106.  Plaintiff also complained that since his March 2008 injury, he had been experiencing numbness, swelling and pain.

107.  Dr. Haile noted no loss of motor function.

108.  Dr. Haile also noted that the impression of plaintiff's May 5, 2008 MRI of his cervical spine was a C2 cervical cord lesion, but that the differential diagnoses included contusion, demyelinization, a possible infarct, and less likely, a tumor.

109.  Dr. Haile also noted that plaintiff's x-ray of his right ankle showed no acute osseous abnormalities.

110.  Dr. Haile assessed plaintiff with a C-spine lesion and wrote an order on June 8, 2008 for an MRI of plaintiff's C-spine with gadolinium sequence, as was recommended by the Radiologist, Dr. Schultz, and for plaintiff to follow-up in two weeks.

111.  On June 16, 2008, Dr. Haile examined plaintiff again, but plaintiff had no new issues.[31]  (Haile Decl. ¶ 6 & Ex. C.)

112.  Dr. Haile noted no motor function loss and plaintiff said he was improving over the last three months.[32]  (Haile Decl. ¶ 6 & Ex. C.)

113.  Dr. Haile noted that plaintiff's MRI of his C-spine with gadolinium sequence had been ordered and was pending.

---

[31]  Without citing to specific evidence, plaintiff now claims he was experiencing the following new symptoms:  shooting pain, pain in his groin, throbbing pain in his right foot and leg that kept him awake all night, and "all other pains listed in [his] medical file."  (Dkt. No. 92 at 10.)

[32]  Plaintiff now states he "never told Dr. Haile that [plaintiff] was improving, but that [he] just deal[s] with the pain."  (Dkt. No. 92 at 10.)

1       114.   Dr. Haile wrote an order to renew plaintiff's medications, and to follow up

2  in six weeks after the MRI.

3       115.   Plaintiff submitted a Health Care Services Request Form dated June 29,

4  2008, and was evaluated by the triage registered nurse that same day.

5       116.   In his request form, plaintiff complained of tightness in his right ankle,

6  swelling and numbness in his right leg and foot, and neck pain.

7       117.   During the triage nurse's examination of plaintiff, the nurse noted that

8  plaintiff had a steady gait and was in no apparent distress.   (Haile Decl. ¶ 7 & Ex. D.)

9       118.   Plaintiff's breathing was not labored, he had no tenderness on palpation to

10  his cervical area, and both hands had equal grip.[33]  (Haile Decl. ¶ 7 & Ex. D.)

11      119.   No swelling was noted on both of plaintiff's upper and lower extremities.[34]

12  (Haile Decl. ¶ 7 & Ex. D.)

13      120.   The triage nurse's plan was to refer plaintiff to his PCP.

14      121.   On July 10, 2008, plaintiff had the MRI of his cervical spine with

15  gadolinium ordered by Dr. Haile.

16      122.   The MRI showed that the lesion in the cervical cord at C2 had not enhanced.

17      123.   The differential diagnoses included contusion, myelomalacia and

18  demyelinization with negative mass effect.

19      124.   A follow-up MRI was recommended for six months.

20      125.   During a chronic care visit on August 4, 2008, plaintiff claimed he was

21  paralyzed after a basketball injury, the MRI of his C-spine was noted, and plaintiff was examined

22

23         [33]  Plaintiff now claims, without citing to evidence, that his breathing was labored during
   the times he was swollen, and that Dr. Haile did not touch the sides of plaintiff's neck, where
   plaintiff claims his nerve damage is located.  (Dkt. No. 92 at 10-11.)

24

25         [34]  Plaintiff now claims that he pointed out areas on his right side that were bigger than his
   left, but that Dr. Haile said that all she saw was muscle, and that most of the exam was done with
26  plaintiff's clothing on.  (Dkt. No. 92 at 11.)  Plaintiff also claims Dr. Haile would not take the
   time to feel what plaintiff believed to be fluid in his right leg and stomach.  (Id.)

1   by Dr. Pai.  (Haile Decl. ¶ 9 & Ex. F.)

2          126.  Dr. Pai discussed the results of plaintiff's C-spine MRI and his treatment

3   plan.[35]  (Haile Decl. ¶ 9 & Ex. F.)

4          127.  Dr. Pai noted that he observed no symptoms and that plaintiff stated that he

5   was able to work out on the bars and do push-ups and dips without any symptoms after

6   exercise.[36]  (Haile Decl. ¶ 9 & Ex. F.)

7          128.  Dr. Pai noted that plaintiff had 5 out of 5 power during the neurological

8   examination.

9          129.  On September 11, 2008, plaintiff was seen again by Dr. Pai.  No physical

10   exam was performed because plaintiff reported no new needs or medical issues.  (Dkt. No. 81-1

11   at 17.)

12          130.  Dr. Haile examined plaintiff again on October 20, 2008.

13          131.  Plaintiff presented for follow-up; Dr. Haile noted that plaintiff had no

14   complaints other than recurrent pain in his right leg and foot.  (Dkt. No. 81-1 at 20.)

15          132.  Plaintiff also complained of pain, numbness, and hypersensitivity to touch

16   over his neck, and back of head.[37]  (Haile Decl. ¶ 10 & Ex. G.)

17          133.  Dr. Haile's examination of plaintiff's right ankle was negative.

18          134.  Dr. Haile wrote an order for an MRI of plaintiff's C-spine and Lumbar

19   spine, an x-ray of his right ankle/foot, Tylenol twice a day for pain for 30 days and to follow-up

20

21          [35]  Plaintiff claims Dr. Pai also told him that his symptoms were all in his head and that he
should try not thinking about it so much.  (Dkt. No. 92 at 11.)

22

23          [36]  Plaintiff now claims that he told Dr. Pai that plaintiff just works out through the pain
because he had to get used to it.  (Dkt. No. 92 at 11-12.)  Plaintiff denies telling any doctor that
plaintiff did not have any pain.  (Id.)

24

25          [37]  Although Dr. Haile reads the medical record as stating, "back *and* head," the writing
"of" in other parts of the medical record supports a finding that Dr. Haile wrote "back *of* head."
(Dkt. No. 81-1 at 20.)  Compare "complains *of* pain" on the line above, and "x-ray *of* right ankle"

26   in the diagnostics line below.

1   in 30 days.

2        135.  On October 28, 2008, plaintiff had the x-ray taken of his right foot and ankle

3   which Dr. Haile had ordered for him.

4        136.  While degenerative changes were noted, there was no acute osseous

5   abnormality discovered.

6        137.  On December 10, 2008, Dr. Haile examined plaintiff for complaints of right

7   scrotal pain and a lump.

8        138.  Plaintiff had no complaints or medical issues regarding his neck.  (Haile

9   Decl. ¶ 12 & Ex. I.)

10       139.  Dr. Haile wrote an order for a scrotal ultrasound and to renew plaintiff's

11  medications, and also submitted a physician request for services for a scrotal ultrasound on

12  plaintiff's behalf.

13       140.  The ultrasound was completed on December 29, 2008 and showed bilateral

14  testicular cysts, bilateral hydroceles, and right epididymal head cyst.

15       141.  Plaintiff was subsequently followed up by the urologist.

16       142.  On December 10, 2008, the MRIs of plaintiff's cervical spine and lumbar

17  spine, ordered by Dr. Haile, were ordered.

18       143.  The MRI of plaintiff's cervical spine showed no changes except that the

19  lesion was slightly smaller than on the May 5 and July 10, 2008 MRIs.

20       144.  A six-month follow-up was recommended by Dr. Nicks, the Radiologist.

21       145.  The impression of plaintiff's lumbar spine was mild degenerative disc

22  disease at L3-4.

23       146.  On March 30, 2009, plaintiff was seen by Nurse Practitioner (NP) Jolley.

24       147.  Plaintiff complained of a right foot injury while he was working at the

25  canteen.

26       148.  Plaintiff stated he had stepped off a crate and inverted his foot, causing pain.

149.   NP Jolley's examination of plaintiff's ankle was normal.

150.   An x-ray was taken which was negative for fractures.

151.   NP Jolley wrote an order for an air ankle splint/brace, a lay-in for two days and ice packs.

152.   On April 29, 2009, Dr. Haile examined plaintiff again.

153.   Plaintiff said that he still experienced numbness/pain at the base of his head.

154.   Dr. Haile noted that plaintiff was able to use his hands and there was no weakness.

155.   Dr. Haile wrote an order for a repeat MRI of plaintiff's cervical spine and also submitted a physician request for services for an outpatient neurology consultation for plaintiff.

156.   On May 8, 2009, Dr. Haile examined plaintiff again.

157.   Plaintiff was an add on and said that he had had right thigh swelling at the April 29, 2009 appointment (which he had not mentioned on April 29, 2009) but it was gone at the present time.

158.   Dr. Haile noted that plaintiff's leg swelling issue was resolved, and he had no new issues.

159.   Dr. Haile wrote an order for plaintiff to follow-up in 30 days as previously planned.

160.   On May 19, 2009, plaintiff was examined by Dr. Mummaneni at University of California, San Francisco ("UCSF") Medical Center in the Department of Neurological Surgery.

161.   Dr. Mummaneni noted that plaintiff underwent flexion/extension x-ray views in the clinic.

162.   Those x-rays showed what appeared to be an old sclerotic type 2 dens fracture.

163.   There was no abnormal motion at that level on flexion/extension.

164.   The MRI showed hyperintensity in the posterior portion of the spinal cord at the C2 level.

165.   Dr. Mummaneni noted that this result likely represented myelomalacia.[38]

166.   Dr. Mummaneni assessed that plaintiff was "a 1 year status post traumatic C-spine injury with possible old C2 dens fracture."  (Dkt. Nos. 81-3 at 3; 92-1 at 61.)

167.   Dr. Mummaneni's plan was to get a follow-up MRI of the cervical spine with and without contrast, and to get a CT scan of the cervical spine, and noted it was "possible that [plaintiff] may need a decompression and fusion at this level depending on the outcome of these studies."  (Dkt. Nos. 81-3 at 3; 92-1 at 61.)

168.   On May 27, 2009, Dr. Haile examined plaintiff for complaints of constipation and bleeding hemorrhoids.

169.   Dr. Haile wrote an order for plaintiff to follow-up at UCSF and also submitted a physician request for services for plaintiff to receive an MRI and CT scan at UCSF, as recommended by Dr. Mummaneni.

170.   On June 5, 2009, plaintiff was scheduled in error, but Dr. Haile saw him and noted that plaintiff had no new issues.[39]  (Haile Decl. ¶ 19 & Ex. P.)

171.   On June 16, 2009, plaintiff had another appointment with Dr. Mummaneni at UCSF Department of Neurological Surgery, and had an MRI and CT scan of his cervical spine.

172.   On physical examination, Dr. Mummaneni noted that plaintiff had intact sensation throughout his lower extremities, and motor strength was 5 out of 5 throughout all

---

[38]   "Myelomalacia" is defined as a softening of the spinal cord. STEDMAN'S MEDICAL DICTIONARY 1270 (28th ed. 2006).

[39]   Plaintiff contends he was concerned about the same symptoms which plaintiff claims resulted from the March 12, 2008 injury.  (Dkt. No. 92 at 12.)  Plaintiff states he was concerned about nerve damage, the swelling, loss of feeling, etc.  (Id.)

1  muscle groups tested.

2          173.  Plaintiff was able to toe stand and heel stand to command, and was able to

3  perform a tandem gait with only minimal difficulty.

4          174.  The CT and MRI revealed that the fracture was healed, and the MRI

5  revealed that there was evidence of a persistent C2 cord contusion with cord signal change.  (Dkt.

6  Nos. 81-3 at 13; 92-1 at 62.)  There was no evidence of associated stenosis.  (Id.)

7          175.  Dr. Mummaneni determined that no further neurosurgical intervention was

8  required, but that plaintiff might see a neurologist to ensure that the cord signal change at C2 was

9  not related to any demyelinating process, and the doctor suspected "this cord signal change

10  represents an old cord contusion from his trauma."  (Id.)

11          176.  On June 29, 2009, Dr. Haile examined plaintiff again.

12          177.  While plaintiff was complaining of right scrotal swelling, Dr. Haile noted

13  that Dr. Mummaneni suggested a neurologist evaluation for the persistent C2 cord signal change,

14  and thus, Dr. Haile submitted a physician request for services for a neurology consultation at

15  UCSF for plaintiff.

16          178.  On October 19, 2009, plaintiff was evaluated by Dr. Cuneo, a Clinical

17  Professor of Neurology at UCSF, Department of Neurology, "regarding the possibility of an

18  underlying demyelinating disease."  (Dkt. No. 81-3 at 23.)

19          179.  Dr. Cuneo reviewed plaintiff's diagnostic images and performed a physical

20  examination.

21          180.  Besides noting Dr. Mummaneni's previous findings, Dr. Cuneo's neurologic

22  review of plaintiff's symptoms was negative.  (Dkt. No. 81-3 at 24.)

23          181.  Dr. Cuneo opined that "[i]t seems highly likely that this cord signal change

24  is secondary to the focal spinal cord trauma."  (Dkt. No. 81-3 at 24.)  Dr. Cuneo concluded that

25  no further neurological workup/follow-up was needed unless plaintiff has an increasing deficit.

26          182.  While Dr. Haile provided continuous care for plaintiff's neck injury,

22

1  plaintiff was also provided continuous care and treatment for numerous other medical issues

2  including, but not limited to, HIV, swollen testicles, groin pain, and a lymphadenopathy.

3       183.  Plaintiff was continuously followed for these other conditions by Dr. Haile,

4  other physicians, a nephrologist, and a urologist.

5       184.  Dr. Haile does not have control over how soon a patient can be seen by an

6  outside provider.

7       185.  Scheduling of outpatient appointments with outside providers is made by the

8  Utilization Management nurse and is based, in part, on the availability of the specialist.

9       186.  Since June 2006, defendant McKenzie has held the position of Health Care

10  Appeals Coordinator at CMF.

11       187.  Defendant Dr. Andreasen has been a licensed physician and surgeon in the

12  State of California since 1991 and has been employed by the CDCR at CMF as a physician and

13  surgeon since January 21, 1991.

14       188.  In January 1993, Dr. Andreasen became the Chief Medical Officer

15  ("CMO"), Inpatient Services, at CMF.

16       189.  Bick has been a licensed physician and surgeon in the State of California

17  since 1993 and has been employed by the CDCR at CMF since 1993.

18       190.  Bick is board certified in infectious diseases and internal medicine.

19       191.  Between 2007 and 2010, Bick was the Chief Deputy of Clinical Services.

20       192.  Defendant Grannis was the Chief of the Inmate Appeals Branch (IAB) of the

21  CDCR from 2002 to 2009.

22       193.  Walker was the Chief of the Office of Third Level Appeals - Health Care

23  ("OTLA") for the California Prison Health Care Services (now known as the California

24  Correctional Health Care Services ("CCHCS")) from July 1, 2009 to December 4, 2010.

25       194.  There is an inmate appeal system at CMF and the CDCR.

26       195.  At the time of plaintiff's appeals, in the case of inmate appeals that

concerned medical issues, McKenzie's office would receive these appeals when an inmate first submitted the appeal.

196.   When McKenzie's office received an appeal, she would determine whether the appeal should be accepted as a health care appeal or whether it should be rejected as a health care appeal because it did not concern health care issues or for technical reasons under Cal. Code Regs.,Title 15 §§3084, et seq.

197.   Once McKenzie determined that an inmate's appeal should be accepted, she would assign the appeal for review at the first level to licensed clinical staff.

198.   The licensed clinician then conducted a fact finding review into the appeal issues and thoroughly reviewed supporting documentation including the inmate's Unit Health Record (UHR).

199.   Once the fact finding review was completed, the licensed clinician prepared a response to the appeal at the first level.

200.   That response, along with the inmate's appeal, was then reviewed by the inpatient Chief Medical Officer (CMO) who made the final decision.

201.   At all times relevant to this lawsuit, Dr. Andreasen was the inpatient CMO.

202.   If an inmate was displeased with the first level response, he could appeal to the second level of review.

203.   McKenzie's role as the Health Care Appeals Coordinator at the second level of review was to assign the appeal for review to reviewers who generally were licensed clinical staff working with her to ensure that the inmate's appeal was responded to appropriately at the first level of review and to conduct fact finding inquiries into any new issues or complaints since the issuance of the first level appeal decision.

204.   The inmate's appeal issues and all supporting documentation, including the inmate's UHR, were reviewed by the reviewers who prepared a response at the second level of review.

205.  That response, along with the inmate's appeal, was then reviewed by defendant McKenzie.

206.  After McKenzie's review, she gave the reviewer's response, along with the inmate's appeal, to the outpatient CMO for review.

207.  At all times relevant to this suit, Dr. Nicolas Aguilera was the outpatient CMO.

208.  After Dr. Aguilera's review, McKenzie would get the second level appeal response back from him, process the appeal, and then give the appeal response to the Chief Deputy, Clinical Services, for final approval.

209.  As the Health Care Appeals Coordinator, McKenzie's duties are entirely administrative and she plays no role in the clinical care and treatment of inmates.

210.  McKenzie is not a licensed medical provider or clinician.

211.  McKenzie is not qualified to pass clinical judgment on the care that an inmate is or was receiving.

212.  McKenzie is neither permitted nor qualified to recommend a particular type of medical treatment, nor is she permitted or qualified to grant or deny a request for a certain type of medical treatment.

213.  McKenzie is not qualified or permitted to provide medical care to an inmate.

214.  Similarly, McKenzie does not have the authority to instruct a doctor to see an inmate or to provide a certain type of treatment.

215.  As of August 2008, the OTLA began receiving and reviewing all medical appeals at the third level of review except medical staff complaints, and in November 2008, it began receiving and reviewing all medical appeals and medical staff complaints at the third level of review.

216.  The purpose of the third formal level of review was to provide an independent and objective review of previous levels of appeal responses and, on a statewide

basis, provide information as to departmental compliance with court orders, state law,

regulations, rules, and administrative directives.

217. If an inmate's appeal was sent to the IAB for the third formal level of
review, the role of the Appeals Examiner is to ensure that a response to the appeal was provided,
review the relevant data and information, and either confirm or reject the institution's decision.

218. The Appeals Examiner's review of the inmate's appeal may or may not
involve an interview with the inmate.

219. Most interviews are conducted at a lower level of review.

220. Similarly, if additional information is necessary, the Appeals Examiner will
request this information from the institution.

221. The Appeals Examiner was then responsible for preparing a director's level
appeal response.

222. That decision and response, along with the inmate's appeal, was then
reviewed by Grannis or her designee.

223. Grannis or her designee would provide final approval to the decision by
signing the prepared response.

224. As Chief of the Inmate Appeals Branch (IAB), Grannis' duties were entirely
administrative and she played no role in the clinical care and treatment of inmates.

225. Grannis is not a licensed medical provider.

226. Grannis was not qualified to pass clinical judgment on the care that an
inmate was receiving.

227. Grannis was neither permitted nor qualified to recommend a particular type
of medical treatment, nor was she permitted or qualified to grant or deny a request for a certain
type of medical treatment.

228. Grannis was not qualified to or permitted to provide medical care to a
patient.

1    229.   Similarly, Grannis did not have the authority to instruct a doctor to see a

2    patient or to provide a certain type of treatment.

3    230.   If the inmate's appeal was sent to the OTLA for review at the third level, the

4    inmate's appeal and all submitted information was reviewed on behalf of the Director by licensed

5    clinicians under Walker's supervision as the Chief of OTLA.

6    231.   Pertinent portions of an inmate's medical records were requested and

7    reviewed.

8    232.   The licensed clinician's decisions, findings and reports were then given to a

9    Health Program Specialist ("HPS") who prepared the formal response.

10    233.   That response, along with the inmate's appeal, was then reviewed by Walker

11    as Chief of the OTLA and she would provide a final response.

12    234.   Walker's response would indicate whether the inmate's medical condition

13    had been fully evaluated by licensed clinical staff and whether he was receiving, or had received,

14    treatment deemed medically necessary.

15    235.   As Chief of the OTLA, Walker's duties were entirely administrative and she

16    played no role in the clinical care and treatment of inmates.

17    236.   Walker is not a licensed health care provider.

18    237.   Walker was not qualified to pass clinical judgment on the care that an

19    inmate was receiving.

20    238.   Walker was neither permitted nor qualified to recommend a particular type

21    of medical treatment, nor was she permitted or qualified to grant or deny a request for a certain

22    type of medical treatment.

23    239.   Walker was not qualified nor permitted to provide medical care to an

24    inmate.

25    240.   Similarly, Walker did not have the authority to instruct a physician to see an

26    inmate or to provide a certain type of medical treatment.

27

1           241.  On April 2, 2008, after McKenzie had accepted plaintiff's appeal for review

2  at the first level,[40] she assigned the appeal for review to J. Weber, RN.

3           242.  Ms. Weber interviewed plaintiff on May 6, 2008 concerning his appeal.

4           243.  In his appeal, plaintiff felt that he should have immediately been seen by a

5  doctor and given a CT or MRI after he suffered his injury on March 12, 2008.

6           244.  Plaintiff believed he should have been observed overnight and given

7  prednisone or dexamethasone.

8           245.  Plaintiff claimed he was still having headaches, neck pain, tingling,

9  numbness and stiffness.

10          246.  Plaintiff requested an immediate MRI, physical therapy, and proper medical

11  care.

12          247.  Ms. Weber thoroughly reviewed plaintiff's appeal issues in conjunction with

13  the examination of supporting documents and prepared the first level appeal response, which in

14  turn was reviewed by Dr. Andreasen on or around May 7, 2008.

15          248.  At the first level of review, Dr. Andreasen noted that plaintiff had been

16  evaluated by Hsueh, who had consulted with the neurologist at CMF, on March 12, 2008, in the

17  Emergency Room at CMF.

18          249.  Plaintiff was diagnosed with a spinal contusion.

19          250.  Plaintiff had returned to the Emergency Room later that evening and was

20  transferred to Doctors Medical Center San Pablo for evaluation.

21          251.  Dr. Andreasen noted that a CT scan of plaintiff's neck was completed, and

22  the CT scan was negative for trauma and fractures.

23          252.  Dr. Andreasen noted that plaintiff had a normal neurological exam in the

24

25

[40] Plaintiff's appeal, Log No. CMF-M-08-0983, was signed by plaintiff on March 29,
26  2008.  (Dkt. No. 82-3 at 2.)

1  Urgent Care Clinic on March 13, 2008.[41]  (Dr. Andreasen Decl. ¶ 7 & Ex. A; McKenzie Decl.

2  Ex. A; Bick Decl., Ex. A; Grannis Decl., Ex. A.)

3          253.  Dr. Andreasen further noted that on March 18, 2008, Dr. Saukhla ordered an

4  MRI for plaintiff but that Dr. Saukhla had informed plaintiff that physical therapy needed to be

5  avoided at that time.

6          254.  Finally, Dr. Andreasen noted that plaintiff's MRI of his neck/brain had been

7  completed on May 5, 2008, and that Dr. DiTomas, the Chief Physician and Surgeon, concluded

8  that prednisone and dexamethasone are not medically indicated in all cases.  (Dkt. No. 82-3 at 7.)

9          255.  On May 7, 2008, Dr. Andreasen partially granted plaintiff's appeal at the

10  first level based on his review of all the issues involved and a thorough review of all supporting

11  documentation.

12          256.  Dr. Andreasen partially granted plaintiff's appeal because plaintiff had been

13  evaluated and treated appropriately and an MRI had been ordered and completed.

14          257.  Dr. Andreasen denied the appeal as to the request for PT because plaintiff's

15  PCP felt that PT was not indicated and should be avoided at that time.

16          258.  Plaintiff was displeased with the first level response and appealed to the

17  second level of review.

18          259.  McKenzie assigned plaintiff's appeal at the second level to a member of the

19  health care staff for review.

20          260.  In his appeal, plaintiff requested in writing the policies and procedural

21  protocol to be followed for a spinal cord injury.

22          261.  Plaintiff claimed that he injured his ankle climbing into his bunk and that he

23  was limping and experiencing pain in his right ankle and foot.

24          262.  Plaintiff also claimed that he experienced "jerking" in his right foot and leg.

25  ─────────────────

26      [41]  Plaintiff disputes that his symptoms were "normal," but cites to no competent medical
evidence refuting Dr. Andreasen's findings.  (Dkt. No. 92 at 13.)

263.   Plaintiff requested monetary compensation and that Hsueh be removed from inmate care because of his insensitivity.

264.   The reviewer thoroughly reviewed plaintiff's appeal issues in conjunction with the examination of supporting documents and found that upon arrival to the B-1 Emergency Room (ER) on March 12, 2008, plaintiff had been properly evaluated by Hsueh, a board certified internist.

265.   It was noted that plaintiff was thoroughly assessed at that time, including a neurological work-up.

266.   Plaintiff had no symptoms of bowel or bladder incontinence.

267.   It was noted that Hsueh consulted with the neurologist, Dr. Capozzoli, and assessed plaintiff with a spinal contusion.

268.   He advised plaintiff to expect resolution of the numbness within a day, but to return to the (ER) if his symptoms worsened.

269.   It was noted that plaintiff returned to the ER later that evening, Dr. Mo evaluated him and plaintiff was transported to Doctor's Hospital in San Pablo.

270.   It was noted that plaintiff was evaluated at Doctor's Hospital in San Pablo and returned to CMF noting negative trauma after completion of the computed tomography (CT).

271.   It was noted that plaintiff discussed his right ankle sprain with Dr. Saukhla on April 14, 2008, but Dr. Saukhla noted no swelling, redness, or pain, and that plaintiff was ambulatory.

272.   It was noted that plaintiff had been followed by Dr. Haile in June 2008 for complaints of numbness, swelling and pain but there was no loss of motor function noted. (McKenzie Decl. ¶ 9 & Ex. A; Bick Decl., Ex. A; Grannis Decl., Ex. A.)

273.   It was noted that an MRI of the C-spine with gadolinium sequence was ordered on June 8, 2008, and was pending.

274.   Dr. Haile noted in the medical chart that he discussed with plaintiff about

1   rehabilitation.  (Dkt. No. 81-1 at 4.)

2         275.  After the reviewer finished the fact finding inquiry into plaintiff's second

3   level of appeal and prepared the second level response, McKenzie reviewed that response and

4   gave it, as well as plaintiff's appeal and all supporting documentation, to the outpatient CMO,

5   Dr. Aguilera.

6         276.  After Dr. Aguilera's review, McKenzie received the appeal response and

7   gave the response, plaintiff's appeal and all supporting documentation to the Chief Deputy,

8   Clinical Services, for final approval.

9         277.  The Chief Deputy, Clinical Services, at that time was Bick.

10         278.  However, in Bick's absence, Ms. Mary Lou Dunlap was authorized to sign

11   for Bick.

12         279.  Ms. Dunlap was a licensed clinical staff member and had served as director

13   of nursing in the past.

14         280.  Ms. Dunlap would review appeals, and all supporting documentation, on

15   behalf of Bick in his absence, such as when he was on vacation or when he was in meetings.

16         281.  At the second level of review, Bick did not sign the appeal; Mary Lou

17   Dunlap did so.

18         282.  Bick did not receive, review, respond to or sign plaintiff's appeal (log

19   number CMF-M-08-00983) at the second level of review.

20         283.  McKenzie has never met and does not know plaintiff.

21         284.  McKenzie never provided plaintiff medical care nor did she play any role in

22   his clinical treatment or medical care.

23         285.  McKenzie was not deliberately indifferent to plaintiff's medical needs.[42]

24

25         [42]  Plaintiff did not dispute this statement.  In his sur-reply, plaintiff concluded by stating
    defendants Hsueh, Saukhla, Haile, and Andreasen should not be granted summary judgment.
26   (Dkt. No. 94 at 5.)

1      286.  Bick never provided plaintiff medical care with respect to his medical

2  conditions raised in his First Amended Complaint, nor did Bick play any role in plaintiff's

3  clinical treatment or medical care with respect to the medical conditions raised in his First

4  Amended Complaint.

5      287.  Bick was not deliberately indifferent to plaintiff's medical needs.[43]

6      288.  Plaintiff was displeased with the second level appeal response and appealed

7  to the Director's Level of Review on July 2, 2008.

8      289.  Plaintiff claimed that he had received inadequate medical treatment

9  following an injury while playing basketball on March 12, 2008.

10      290.  Plaintiff claimed he was paralyzed from the neck down.[44]

11      291.  Plaintiff disagreed with the treatment provided to him.

12      292.  Plaintiff's appeal file, and all submitted information and records, were

13  reviewed by Appeals Examiner J. Stocker, Facility Captain, IAB.

14      293.  J. Stocker contacted the institution to obtain additional information.

15      294.  J. Stocker prepared the director's level decision and that decision and

16  response was reviewed by Grannis on approximately October 23, 2008.

17      295.  In reviewing the appeal response and plaintiff's appeal file during the time

18  frame of his appeal that was dated March 29, 2008, J. Stocker noted that the MRI that was

19  pending at the second level of review was completed on July 10, 2008.

20      296.  J. Stocker noted that a follow-up MRI was recommended for six months.

21      297.  J. Stocker noted that plaintiff had seen his PCP twice since the MRI was

22  taken and the report was received, on August 4 and September 11, 2008.

23

24        [43]  Plaintiff did not dispute this statement.  In his sur-reply, plaintiff concluded by stating
   defendants Hsueh, Saukhla, Haile, and Andreasen should not be granted summary judgment.
25  (Dkt. No. 94 at 5.)

26        [44]  Plaintiff cites to no medical evidence in support of this contention.

1        298.  J. Stocker noted that plaintiff's medical complaints were being addressed by

2  licensed physicians, and that advanced testing had been completed.[45]  (Grannis Decl. ¶ 6 & Ex.

3  B.)

4        299.  Finally, J. Stocker noted that plaintiff should discuss with his PCP any

5  further complaints.

6        300.  Based on J. Stocker's findings that plaintiff had been and was being

7  evaluated by licensed physicians and his medical complaints were being addressed by licensed

8  physicians, J. Stocker determined that his inmate appeal should be denied at the third formal

9  level of review.[46]  (Grannis Decl. ¶ 6 & Ex. B.)

10       301.  J. Stocker also denied plaintiff's request for monetary compensation because

11  monetary compensation is outside the scope of the inmate appeals process.

12       302.  On October 23, 2008, Grannis reviewed and signed the Director's Level

13  response to plaintiff's appeal Log #CMF-M-08-0983.

14       303.  Plaintiff filed a second appeal, Log #CMF-06-09-10466, and on March 5,

15  2009, after McKenzie had accepted plaintiff's appeal for review at the first level, McKenzie

16  assigned the appeal for review to K. Douglas, RN.

17       304.  Ms. Douglas interviewed plaintiff on April 13, 2009 concerning his appeal.

18       305.  In his appeal, plaintiff indicated that in March 2008 he had suffered a spinal

19  cord injury that caused temporary paralysis.

20       306.  Plaintiff claimed that since the accident, he had a limp, decreased sensation,

21

22     [45]  Without citing to specific evidence, plaintiff contends that all of his medical
complaints were not being addressed, "especially the fact of a broken neck and/or nerve damage;

23  [his] swelling, [his] foot/ankle/leg/hip."  (Dkt. No. 92 at 14.)  Plaintiff adduced no evidence that
his C-spine was fractured on March 12, 2008, or that he has been diagnosed with nerve damage.

24

25     [46]  Plaintiff disputes this statement, claiming that both Dr. Saukhla and Haile were not
evaluating plaintiff, but that they were telling plaintiff that he worries too much, that plaintiff was
paranoid, and that nothing was wrong.  (Dkt. No. 92 at 15.)  However, plaintiff points to no

26  evidence demonstrating that J. Stocker was aware of such comments.

1    swelling, numbness, pain, spasms and tingling in his right ankle and leg.

2          307.  Plaintiff requested to see a neurologist to be assessed for nerve damage.

3          308.  Plaintiff also requested a right ankle brace, an MRI of his right ankle and

4    groin, monetary compensation, an ultrasound of his abdomen and proper medical diagnosis and

5    treatment.

6          309.  Ms. Douglas thoroughly reviewed plaintiff's appeal issues in conjunction

7    with the examination of supporting documents and prepared the first level appeal response,

8    which in turn was reviewed by Dr. Andreasen on or around April 14 to April 16, 2009.

9          310.  At the first level of review, Dr. Andreasen noted that plaintiff had been sent

10   out to the Emergency Room at Doctors Medical Center San Pablo on March 13, 2008, where a

11   CT scan was done which was negative for fractures and the examination by the Emergency

12   Room physician was documented as normal.

13         311.  Dr. Andreasen noted that on March 13, 2008, plaintiff had a normal

14   neurological exam and was to continue Motrin as prescribed.  (Dr. Andreasen Decl. ¶ 10 & Ex.

15   B; Bick Decl., Ex. B; Walker Decl., Ex. A.)

16         312.  On March 18, 2008, an MRI of plaintiff's head and neck was ordered.

17         313.  On April 22, 2008, an x-ray of plaintiff's right ankle was done which was

18   negative for fractures.

19         314.  On May 5, 2008, an MRI of plaintiff's cervical spine was done which was

20   within normal limits but indicated a lesion in the C2 position with a recommendation to repeat

21   MRI with gadolinium.

22         315.  On July 10, 2008, an MRI with gadolinium of plaintiff's cervical spine was

23   done which indicated the same lesion without any changes and recommended a follow-up MRI in

24   another six months.  (Id.)

25         316.  In August of 2008, plaintiff's PCP documented that plaintiff had no

26   symptoms and that plaintiff had stated that he was able to work out on the bars, do push-ups, and

34

1    do dips without any symptoms after exercising.[47]  (Id.)

2         317.  Plaintiff had an x-ray done of his right ankle on October 28, 2008 which

3    showed no acute osseous abnormality.

4         318.  During an office visit in November 2008, plaintiff denied any needs or

5    medical issues.

6         319.  In December 2008, plaintiff had another MRI of his cervical spine and no

7    changes were noted to the lesion except that it was slightly smaller.

8         320.  On March 30, 2009, plaintiff's examination of his right ankle was normal

9    and he had an x-ray taken which was negative for fractures.

10        321.  Dr. Andreasen noted plaintiff was given an air ankle splint/brace, a lay-in for

11   two days and ice packs.

12        322.  On April 1, 2009, while plaintiff had complaints of right sided pain and

13   abdominal swelling, on examination, Dr. Haile did not see any swelling or abnormalities and did

14   not see any swelling in his arms or legs.

15        323.  With regard to plaintiff's testes, Dr. Andreasen noted that between

16   November 2008 and February 2009, plaintiff had had two Ultrasounds of his scrotum and had

17   been referred to and been seen by a urologist.

18        324.  With regard to plaintiff's pain and swelling in his right groin, plaintiff had

19   been seen by the nephrologist and his PCP and a request for services had been submitted for

20   surgical evaluation of plaintiff's right inguinal lymphadenopathy.

21        325.  On or about April 14 or April 16, 2009, Dr. Andreasen partially granted

22   plaintiff's appeal at the first level based on his review of all the issues involved and a thorough

23   review of all supporting documentation.

24

25        [47]  Plaintiff contends that he stated he exercises and just deals with the pain and swelling,
     but that he can no longer run, do jumping jacks, crunches, etc., without swelling and pain.  (Dkt.
26   No. 92 at 15.)

326. Dr. Andreasen noted that it was persuasive that plaintiff was receiving adequate medical care for his medical problems.

327. Dr. Andreasen noted that plaintiff had had numerous x-rays and MRIs of his spine, head and ankle.

328. Dr. Andreasen informed plaintiff that it was up to the discretion and medical judgment of his PCP to determine if ordering additional tests was warranted.

329. Dr. Andreasen denied plaintiff's request for an MRI of his ankle and groin because his PCP had not recommended an MRI at that time.

330. Dr. Andreasen partially granted plaintiff's request for a neurological consultation because Dr. Haile had requested to speak to plaintiff during his next PCP visit regarding his request.

331. Dr. Andreasen granted plaintiff's request for proper medical treatment because plaintiff's UHR indicated that he had received continuous care and treatment and his conditions were being discussed with him during each visit.

332. Also, Dr. Haile had stated that she was available to discuss any questions with plaintiff regarding any of his diagnoses or plans for treatment.

333. Dr. Andreasen granted plaintiff's request for a right ankle brace because he had been given one on March 30, 2009.

334. Dr. Andreasen denied plaintiff's request for monetary compensation because monetary compensation is outside the scope of the appeals process.

335. At the second level of review, Bick did not sign the appeal; Mary Lou Dunlap did so.

336. Bick did not receive, review, respond to or sign plaintiff's appeal (log number CMF-06-09-10466) at the second level of review.

337. Plaintiff was displeased with the second level appeal response and appealed to the Director's Level of Review on June 22, 2009.

1    338.  Plaintiff claimed that he was told he had no fractures and that the symptoms

2   he was experiencing were just in his head.

3    339.  Plaintiff reiterated the events of his right ankle injury.

4    340.  Plaintiff requested an MRI of his right foot and ankle.

5    341.  Plaintiff's appeal file, and all submitted information and records, were

6   reviewed by a licensed clinician, who in turn provided these findings to the HPS to prepare the

7   response.

8    342.  Walker's own review of plaintiff's inmate appeal response took place on

9   approximately March 10, 2010.

10    343.  In reviewing the appeal response and plaintiff's appeal file during the time

11   frame of his appeal that was dated March 1, 2009, Walker noted that plaintiff's health record

12   indicated he had received regular and appropriate medical care for the issues raised in his

13   appeal.[48]  (Walker Decl. ¶ 6 & Ex. B.)

14    344.  Walker noted that plaintiff had received ongoing medical evaluations both

15   by his PCP and by specialists as well as diagnostic testing, a temporary appliance (ankle brace)

16   and medication.[49]  (Walker Decl. ¶ 6 & Ex. B.)

17    345.  Walker noted that his PCP did not recommend an MRI of his right foot or

18   ankle at that time.

19    346.  Walker further noted that plaintiff's contention that he had not received

20   adequate medical care had been refuted by the professional health care staff familiar with his

21   ───────────

22    [48]  Plaintiff disputes this fact, claiming that the medical care he was receiving was not
appropriate because he was receiving care for a bruised spinal cord, not care for a fractured c-
spine, nerve damage, or an injured food/ankle/leg/hip.  (Dkt. No. 92 at 15.)  However, plaintiff

23   cites to no medical evidence in support.

24    [49]  Plaintiff disputes this fact claiming he does not recall seeing any specialist in spinal
injuries until he was sent to UCSF.  (Dkt. No. 92 at 16.)  However, Walker reviewed plaintiff's

25   appeal on March 10, 2010, and plaintiff was examined by Dr. Mummaneni at UCSF Medical
Center in the Department of Neurological Surgery on May 19, 2009.  Thus, this fact is deemed

26   undisputed.

1  medical history and who had reviewed his medical records.[50]  (Walker Decl. ¶ 6 & Ex. B.)

2      347.  Based on Walker's findings that plaintiff's medical condition had been

3  evaluated by licensed clinical staff and that he was receiving, and had received, treatment

4  deemed medically necessary, and based on the medical judgment of the physicians, Walker

5  concluded there was no compelling evidence to warrant intervention at the Director's Level of

6  Review and decided that plaintiff's inmate appeal, Log #CMF-06-09-10466, should be denied.[51]

7  (Walker Decl. ¶ 6 & Ex. B.)

8      348.  Walker also denied plaintiff's request for monetary compensation because

9  monetary compensation is outside the scope of the appeals process.

10      349.  On May 7, 2010, Dr. Haile wrote plaintiff a chrono for low bunk housing,

11  stating:

12          This patient has history of chronic neck pain for which he has
            undergone neurologic workup.  He also has left knee instability,
13          swelling, and pain and he had an ongoing workup.  Please allow
            low bunk housing.  If a suitable bunk is unavailable at this
14          institution, he can be transferred to a facility that can meet his
            clinical needs. . . .
15

16  (Dkt. No. 92-1 at 38.)

17      350.  On January 28, 2011, plaintiff was seen by Dr. Sawicki who diagnosed

18  plaintiff with a right hip contracture, and ordered an xray and physical therapy.  (Dkt. No. 92-1 at

19  45.)

20      351.  Plaintiff's right hip x-ray impression was "[a]rthritic changes of the hips,

21  right greater than left without fracture or subluxation."  (Dkt. No. 92-1 at 46.)

22

23  [50]  Plaintiff disputes this fact, claiming that because Walker is not a doctor, and has no training in the medical field, Walker was not qualified to determine that plaintiff's medical care

24  was adequate.  (Dkt. No. 92 at 16.)

25  [51]  Plaintiff disputes this fact, claiming that his medical condition was not adequately evaluated, and that the treatment he received was not in compliance with the standard of care for treating spinal fractures and nerve damage.  (Dkt. No. 92 at 16.)  However, this objection is

26  nonresponsive to how Walker rendered her findings in plaintiff's appeal.

352. Plaintiff was born on November 10, 1973. (Dkt. No. 81-4 at 42.) Thus, plaintiff was 34 years old in March of 2008.

C. Legal Standards

Inadequate medical care does not constitute cruel and unusual punishment cognizable under § 1983 unless the mistreatment rose to the level of "deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976).

> In the Ninth Circuit, the test for deliberate indifference consists of two parts. First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. This second prong -- defendant's response to the need was deliberately indifferent -- is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.

Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations and quotations omitted).

To establish deliberate indifference, a plaintiff must show that defendants knew of and disregarded an excessive risk to his health or safety. Farmer v. Brennan, 511 U.S. 825, 837 (1994). A prison official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inferences." Id. The nature of a defendant's responses must be such that the defendant purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established. McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)), overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997). Deliberate indifference may occur when prison officials deny, delay, or intentionally interfere with medical treatment, or may be demonstrated by the way in which prison officials provide medical care. Id. at 1059-60.

////

39

1    However, a showing of merely inadvertent or even negligent medical care is not

2  enough to establish a constitutional violation.  Estelle, 429 U.S. at 105-06; Frost v. Agnos, 152

3  F.3d 1124, 1130 (9th Cir. 1998).  A mere difference of opinion concerning the appropriate

4  treatment cannot be the basis for an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d

5  330, 332 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  Instead, an

6  inmate must allege facts sufficient to indicate a culpable state of mind on the part of prison

7  officials.  Wilson v. Seiter, 501 U.S. 294, 297-99 (1991).  Accordingly, a difference of opinion

8  about the proper course of treatment is not deliberate indifference, nor does a dispute between a

9  prisoner and prison officials over the necessity for or extent of medical treatment amount to a

10  constitutional violation.  See, e.g., Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004);

11  Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

12    In order to defeat the motion for summary judgment, plaintiff must "produce at

13  least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809 F.2d at 630,

14  that defendants' actions, or failures to act, were "in conscious disregard of an excessive risk to

15  plaintiff's health," Jackson v. McIntosh, 90 F.3d at 332 (citing Farmer, 511 U.S. at 837).

16    D.   Analysis

17        i.   Treating Doctors Hsueh, Haile, and Saukhla

18            a.   Plaintiff's Sur-reply

19    The court begins the analysis with plaintiff's sur-reply, because one of the cases

20  on which plaintiff relies, Greeno v. Daley, 414 F.3d 645 (7th Cir. 2005), provides a framework

21  for many of plaintiff's claims.  Plaintiff claims that in Greeno the court found that "a doctor

22  could be deliberately indifferent for refusing to send a prisoner to a specialist or to order an

23  endoscopy despite the prisoner's complaints of severe pain, and noting that the doctor could not

24  rely on the lack of "objective evidence" since there is no objective evidence of pain."  (Dkt. No.

25  ////

26  ////

40

94 at 3.)  However, the facts in <u>Greeno</u> were egregious,[52] and the medical treatment provided the

plaintiff in <u>Greeno</u> was very different from the medical treatment plaintiff received.

In <u>Greeno</u>, the Seventh Circuit held that an Eighth Amendment violation exists,

despite the inmate being given treatment, where that "treatment . . . was 'so blatantly

inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his

condition."  <u>Id.</u> at 654 (quoting <u>Snipes v. DeTella</u>, 95 F.3d 586, 592 (7th Cir. 1996)).  The court

concluded that summary judgment was not appropriate because "a jury could conclude that

[defendant] was deliberately indifferent to Greeno's deteriorating medical condition . . . [because

defendant] failed to respond to Greeno's persistent requests for a bland diet or acknowledge his

repeated contentions that the Maalox was not giving him any relief."  <u>Id.</u>  There was also a

factual dispute as to whether the prison doctor's refusal over a two-year period to refer Greeno to

a specialist constituted deliberate indifference.  <u>See id.</u>  In particular, the Seventh Circuit noted

the prison doctor's "emphatic ban on treatment for Greeno."[53]  <u>Id.</u>

Here, plaintiff presented to Dr. Hsueh on March 12, 2008, who had an x-ray

taken, and when the x-ray revealed no fracture, ordered Ibuprofen, and returned plaintiff to his

cell with instructions to return if his symptoms worsened.  Plaintiff did return, and was then

taken to an outside emergency room, where a CT scan was taken, again showing no spinal

fracture.  Unlike the plaintiff in <u>Greeno</u>, plaintiff did not constantly present to medical personnel

complaining of severe pain or worsening symptoms, or that plaintiff's medical condition was

deteriorating.  Rather, the medical records reflect plaintiff's symptoms were improving, despite

---

[52]  Greeno suffered severe heartburn and vomiting of blood for over two years.  Greeno's
constant complaints of severe pain were intermittently treated with Maalox and Pepto-Bismol,
which created a new medical problem for Greeno, and Ibuprofen, which exacerbated Greeno's
underlying medical problem.  It was over two years before Greeno was seen by a gastrointestinal
specialist, who performed an endoscopy and diagnosed Greeno with a distal ulcer in his
esophagus.  <u>Id.</u>, 414 F.3d at 652.

[53]  Greeno's medical record contained a March 12, 1997 entry that read:  "per Dr. Daley's
orders - *no* PT, *no* pain medication, *no* gastroscopy" (emphasis in original).  <u>Id.</u>, 414 F.3d at 651.

1  plaintiff's current claims to the contrary.  Indeed, Dr. Cuneo noted plaintiff's subjective

2  complaints on October 19, 2009:

> [Plaintiff's] current status is unchanged since January 2009, with
> the injury having occurred in March 2008.  Since then he describes
> a decreased sensation in his right foot, right lower extremity, and
> right lower abdomen and a tingling sensation in his right foot, right
> lower extremity, and right lower abdomen and a tingling sensation
> in his right hand.  Perhaps twice a week he will have neck pain
> which does not correlate with neck range of motion and lasts for
> only minutes at a time.  His primary complaint is that it feels to
> him as if his right leg is not as responsive to his wishes as it used to
> be.

9  (Dkt. No. 81-3 at 23.)  The medical evidence does not reflect that any defendant refused to refer

10  plaintiff to a specialist.  Rather, the record reflects that plaintiff saw two different specialists.

11  Moreover, these neurological specialists determined that plaintiff required no further

12  neurological follow-up, and ordered no additional medical treatment.  Plaintiff failed to rebut this

13  evidence.

14          While it appears plaintiff suffers pain and intermittent swelling, it does not keep

15  him from walking or exercising, including working on the bars, and doing dips and push-ups.

16  Despite plaintiff's claim in the operative complaint that he has a history of acid reflux disease

17  and other stomach problems, and that he should not take Motrin (dkt. no. 10 at 5), plaintiff

18  adduced no evidence in support of these statements, and the medical evidence submitted here

19  reflects that plaintiff reported no untoward medical problems resulting from his continued

20  prescription for pain relievers, as suffered by the plaintiff in Greeno.  Moreover, plaintiff is

21  prescribed Motrin for pain and inflammation, and the record evidence does not reflect that

22  plaintiff presented with complaints that this prescribed medication was not adequate to address

23  plaintiff's pain.  Thus, unlike in Greeno, plaintiff's pain allegations are not supported by the

24  record.

25          Plaintiff believes that he suffered a broken neck on March 12, 2008, and should

26  have been given steroids and a CT or MRI immediately upon presentation to medical personnel

1   following the incident.  However, plaintiff presents no evidence, medical or otherwise,

2   demonstrating that he sustained a broken neck on March 12, 2008, or that an alternative course of

3   treatment was medically required.  Rather, Dr. Hsueh, in conjunction with a board-certified

4   neurologist, Dr. Capozzoli, opined that plaintiff sustained a spinal contusion, and treated him

5   accordingly.  Thus, in the face of this diagnosis, plaintiff's difference of opinion concerning Dr.

6   Hsueh's diagnosis, without expert medical evidence, cannot be the basis of an Eighth

7   Amendment violation.  Jackson v. McIntosh, 90 F.3d at 332; Franklin, 662 F.2d at 1344.

8          Moreover, even if Dr. Hsueh misdiagnosed plaintiff's injury, such an alleged

9   misdiagnosis, without more, only demonstrates negligence or medical malpractice, and does not

10  rise to the level of a civil rights violation.  "Mere 'indifference,' 'negligence,' or 'medical

11  malpractice' will not support this cause of action."  Broughton v. Cutter Laboratories, 622 F.2d

12  458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06.)

13          In addition, the subsequent CT and MRI, performed at the request of specialists,

14  revealed that any "possible" fracture was healed.  (Dkt. No. 81-3 at 13.)  Dr. Mummaneni

15  determined that no further neurosurgical intervention was required, but that plaintiff may see a

16  neurologist to ensure the cord signal change at C2 was not related to any demyelinating process.

17  (Id.)  Plaintiff was subsequently seen by neurologist Dr. Cuneo, also at UCSF, who determined

18  plaintiff's symptoms were negative after a neurologic review, and also concluded that no further

19  neurological workup/follow-up was needed absent "increasing deficit."  (Dkt. No. 81-3 at 24.)

20  Plaintiff submitted no medical evidence to rebut the findings of these specialists, or confirming

21  that some alternative medical treatment should have been provided.

22          For all of the above reasons, plaintiff's reliance on Greeno is unavailing.

23                      b.  Declaration of Inmate Brown

24          Plaintiff provided the declaration of inmate Kendrick Brown, who claimed he

25  witnessed, on several occasions while working out with plaintiff, that plaintiff's "whole right

26  side swell[s] up (from his right foot to his upper torso)," and that plaintiff's "breathing become[s]

43

heavy and his right leg begin[s] to go out on him (twisting outward) while jogging." (Dkt. No. 92-1 at 48.) Because Mr. Brown is not a doctor, his observation of plaintiff's symptoms, without more, does not demonstrate deliberate indifference on the part of plaintiff's treating physicians.

### c. Plaintiff's Declaration

Plaintiff's declaration addressed several issues, which the court addresses seriatim.

### i. Knowledge of MRI Results

Plaintiff declared that Drs. Saukhla and Haile had knowledge of plaintiff's possible C-2 spine fracture on or about May 5, 2008, but ignored the differential diagnoses, chose not to properly treat the fracture, and told plaintiff he worried too much and that nothing was wrong with plaintiff. (Dkt. No. 92-1 at 3.) Plaintiff cited to his Exhibit E; however, no Exhibit E was appended to this filing.

Dr. Saukhla ordered the MRI. On May 5, 2008, the results of plaintiff's MRI reflected the radiologist's impression that plaintiff suffered from a C2 cervical cord lesion (UDF 94), and that the differential diagnoses included contusion, demyelinization, a possible infarct, and less likely, a tumor. (UDF 95.) Plaintiff cited to no medical evidence demonstrating what medical treatment should have been provided by Dr. Saukhla from May 5, 2008, to June of 2008, when Dr. Haile became plaintiff's PCP. (UDF 99.)

Moreover, the records reflect that Dr. Haile did not ignore or fail to treat plaintiff. Rather, Dr. Haile ordered the MRI with gadolinium sequences on June 5, 2008, one month after the May 5, 2008 MRI test results. (UDF 110.) As for the differential diagnoses, plaintiff adduced no evidence as to what additional medical treatment Dr. Haile should have provided in response. Moreover, the record reflects that plaintiff was treated by Dr. Haile and other medical professionals on numerous occasions following the May 5, 2008 MRI. (UDF 111 (Dr. Haile); UDF 115-20 (RN); UDF 125-28 (Dr. Pai); UDF 129 (Dr. Pai); UDF 130-34, 137-39 (Dr. Haile); UDF 146 (NP); UDF 152-55, 156-59 (Dr. Haile). On this record, the court cannot find that Dr.

1  Haile ignored the differential diagnoses or failed to properly treat plaintiff.

2      Accordingly, the court cannot find that either Dr. Saukhla or Dr. Haile were

3  deliberately indifferent to the May 5, 2008 MRI test results.

4                              ii.  <u>Pain</u>

5      Plaintiff declared that his pain persisted for more than thirty days, and past the

6  anticipated healing time.  (Dkt. No. 92-1 at 6.)  In his sur-reply, plaintiff correctly noted that

7  courts have found that pain can constitute a serious medical need.  (Dkt. No. 94 at 1-2.)  In the

8  operative complaint, plaintiff alleged that defendants treated him "only with Ibuprofen."  (Dkt.

9  No. 10 at 3.)

10      According to <u>McGuckin</u>, the unnecessary continuation of pain may constitute the

11  harm necessary to establish that an Eighth Amendment violation resulted from a delay in

12  providing medical care.  <u>Id</u>., 974 F.2d at 1062.  But continuous pain alone does not satisfy all the

13  elements of deliberate indifference.  <u>See</u> <u>Jett</u>, 439 F.3d at 1096 (harm caused by indifference is

14  only one of two elements under the second prong of the Ninth Circuit's deliberate indifference

15  test).  In order to satisfy the second prong, plaintiff must still show "a purposeful act or failure to

16  respond to a prisoner's pain or possible medical need."  <u>Id</u>.

17      Here, plaintiff failed to raise material issues of fact regarding whether the

18  prescriptions of Ibuprofen (or Motrin) for plaintiff's pain amounted to deliberate indifference.

19  Plaintiff provided no evidence that any of these defendants knew Ibuprofen would be insufficient

20  for treating his pain.  The record does not reflect that plaintiff presented to his treating doctors

21  and complained that the prescribed Ibuprofen or Motrin was ineffective.  Thus, there is no

22  evidence before the court that the Ibuprofen was insufficient to treat the pain.  <u>McGuckin</u>

23  requires plaintiff to show that the nature of defendants' responses was such that each defendant

24  purposefully ignored or failed to respond to his pain or possible medical need.  <u>Id</u>., 974 F.2d at

25  1060.  Plaintiff failed to establish any triable issues of material fact as to whether defendants

26  violated his Eighth Amendment rights as to his pain allegations.

iii.  Alleged Delay

Finally, plaintiff declared that defendants were deliberately indifferent based on the delay in sending plaintiff to the specialist at UCSF.  (Dkt. No. 92-1 at 6.)  Plaintiff claimed that he was not referred to a specialist until after his second administrative appeal was filed on March 1, 2009.  (Id.)

As noted above "[i]ndifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care."  Jett, 439 F.3d at 1096; McGuckin, 974 F.2d at 1060.  There is no Eighth Amendment violation if any delay in treatment is not harmful.  Shaply v. Nevada Bd. Of State Prison Com'rs., 766 F.2d 404, 407 (9th Cir. 1985).

The court acknowledges the potential concern that plaintiff did not see a specialist until May 19, 2009, over one year and two months after he suffered his injury on March 12, 2008.  In this court's view, the initial delay was not problematic because the x-ray and CT scan did not reflect a spinal fracture.  But once plaintiff continued to present with neurological symptoms, it was appropriate for plaintiff to see an outside specialist within a reasonable time. The radiologist's impression that plaintiff sustained a cervical cord lesion, along with the differential diagnoses, suggests plaintiff should be seen by a specialist, and that a delay of over one year was possibly unreasonable.

However, in opposition to the instant motion, plaintiff adduced no evidence demonstrating that the named defendants caused, or were responsible for, the delay.  See McGuckin, 974 F.2d at 1062 (affirming grant of summary judgment in favor of two physicians because the record failed to demonstrate that either was responsible for scheduling diagnostic examinations or hindered the performance of such examinations in that case).

Dr. Hsueh did not treat plaintiff after the initial injury on March 12, 2008.

Although plaintiff claims Dr. Saukhla should have referred plaintiff to a specialist on March 18, 2008, plaintiff's prior x-ray and CT scan were negative for spinal fracture, and

1   plaintiff adduced no competent medical evidence that it was medically inappropriate for Dr.

2   Saukhla to order an MRI and await results prior to referring plaintiff to an outside specialist.[54]

3   Plaintiff had the MRI on May 5, 2008.  Dr. Saukhla did not treat plaintiff after June 2008.  (UDF

4   99.)  This court cannot find that the delay between the May 5, 2008 MRI results, and June of

5   2008, when Dr. Haile took over, was unreasonable as to Dr. Saukhla.

6          Dr. Haile treated plaintiff after June, 2008, but it is undisputed that Dr. Haile did

7   not have control over how soon a patient can be seen by an outside provider (UDF 184), and that

8   the scheduling of outpatient appointments with outside providers is made by the Utilization

9   Management nurse, and is based, in part, on the availability of the specialist (UDF 185).  Plaintiff

10  failed to adduce evidence demonstrating on what date the referral to a specialist was made, so it

11  is unclear on this record whether the delay was based on (a) someone's failure to order such a

12  referral, (b) the apparent difficulty in diagnosing plaintiff's injury, or (c) a scheduling issue.

13  Although plaintiff vaguely ties his referral to the filing of plaintiff's second administrative

14  appeal, plaintiff provided no facts or evidence supporting such a connection.

15         Most importantly, plaintiff tendered no evidence suggesting that any delays in his

16  medical treatment ultimately caused him harm.  See McGuckin, 974 F.2d at 1059; Shapley, 766

17

18         [54]  In the operative complaint, plaintiff argued that Dr. Saukhla refused to order physical
    therapy or to refer plaintiff to a specialist, but would order an MRI "for plaintiff's comfort."
19  (Dkt. No. 10 at 5.)  Plaintiff contended that the refusal to order physical therapy demonstrated
    that Dr. Saukhla recognized that plaintiff's injury was more severe than a "spinal compression,"
20  and that the alleged refusal to refer plaintiff to a specialist, and the comment, "for plaintiff's
    comfort," demonstrate Dr. Saukhla was deliberately indifferent.  (Id.)  However, review of the
21  medical record does not reflect that plaintiff asked for a referral to a specialist, or that Dr.
    Saukhla refused to refer plaintiff to a specialist.  Moreover, Dr. Saukhla ordered an MRI.  In light
22  of the prior negative results from plaintiff's x-ray and CT scan, it was reasonable for Dr. Saukhla
    to order an MRI, whether or not it was for plaintiff's "comfort."  Even assuming, arguendo, Dr.
23  Saukhla refused to refer plaintiff to a specialist, plaintiff presented to Dr. Saukhla less than one
    week post-injury, and the medical records reflected no objective source for plaintiff's complaints,
24  thus supporting the order for further testing in the form of an MRI.  In addition, plaintiff adduced
    no expert medical opinion that Dr. Saukhla should have provided different medical treatment on
25  March 18, 2008, or that an MRI was not the appropriate course of action at that time.  Moreover,
    the fact that Dr. Saukhla refused to order physical therapy supports this court's view that the
26  doctor was not deliberately indifferent.

1    F.2d at 407.  Instead, plaintiff claims he still suffers symptoms from his spinal injury, including

2    pain.  However, neither specialist ordered additional medical treatment for plaintiff.  Indeed, Dr.

3    Cuneo opined that the cord signal change is secondary to the focal spinal cord trauma, and that if

4    plaintiff's "subtle functional difficulty with the right leg and possibly the patchy decreased

5    vibratory sensation of the right leg were related to the trauma, then the deficit should be stable

6    over time." (Dkt. No. 81-3 at 24.)  Dr. Cuneo's report suggests that plaintiff's symptoms, if

7    related to the March 2008 injury, should stabilize over time, and Dr. Cuneo did not recommend

8    additional medical treatment.  Also, the record demonstrates that defendants adequately

9    addressed plaintiff's complaints regarding pain by continuously providing him with pain

10   medication, as discussed above.  Plaintiff failed to provide an expert medical opinion

11   demonstrating that any remaining symptoms were caused by the delay, as opposed to simply

12   being residual symptoms plaintiff may face regardless of treatment.  Thus, defendants are entitled

13   to summary judgment.

14                            c.  Remaining Claims from Operative Complaint

15              In the operative complaint, plaintiff also claimed that Dr. Saukhla was deliberately

16   indifferent in treating plaintiff's ankle injury, which plaintiff claims occurred as a result of his

17   spinal injury. (Dkt. No. 10 at 5.)  Plaintiff argued that Dr. Saukhla showed wanton disregard by

18   dismissing plaintiff as paranoid, diagnosing plaintiff with an ankle sprain that would go away,

19   and ignoring the severity of plaintiff's condition. (Id.)  However, the April 14, 2008 medical

20   record notes that plaintiff was "very paranoid about tendon/ligament rupture, etc. fracture, etc.

21   despite my reassurance." (Dkt. No. 82-1 at 29.)  Although Dr. Saukhla's physical exam reflected

22   that plaintiff's ankle was not fractured, he ordered an x-ray, which showed no acute osseous

23   abnormality, meaning no problem with plaintiff's ankle bone. (Dkt. Nos. 82-1 at 32; 82 at 5.)

24   This record supports the court's finding that Dr. Saukhla was not deliberately indifferent to

25   plaintiff's serious medical needs because he ordered additional tests despite contrary findings on

26   physical exam.  Moreover, notwithstanding plaintiff's current claim that Dr. Saukhla "knew or

should have known that plaintiff was experiencing severe pain in his head, neck, and right
ankle," plaintiff's health care services form, completed by plaintiff, did not articulate the source
of plaintiff's sore ankle and knee, and did not mention plaintiff's neck.  (Dkt. No. 82-1 at 27.)
Also, plaintiff's use of the term "sore" does not equate to "severe."  Dr. Saukhla's report reflects
the ankle pain had decreased, and plaintiff was able to walk well, and noted no pain on
examination, which appears supported by the x-ray result.  Finally, plaintiff adduced no medical
evidence contradicting Dr. Saukhla's report and declaration.

### d. Conclusion

        For all of the above reasons, this court finds that plaintiff failed to demonstrate
that his treating doctors were deliberately indifferent.  The record demonstrates that plaintiff was
provided appropriate and adequate care in response to his medical needs.  Plaintiff received
extensive objective testing, including numerous x-rays, two CT scans, and multiple MRIs.  In
addition to prison doctors and medical staff, plaintiff was seen by two outside specialists:  a
neurosurgeon (twice), and a neurologist, both of whom determined no additional neurological
follow up was required.

        This court finds that based on this record, no reasonable fact-finder could
conclude that defendants Hsueh, Haile, and Saukhla were deliberately indifferent to plaintiff's
serious medical needs in violation of his Eighth Amendment rights.  Plaintiff no doubt suffers
pain, but he failed to provide a genuine issue of material fact in regard to his treatment and to
submit competent evidence to rebut defendants' expert testimony.  Rather, defendants continued
to order tests, referred plaintiff to outside specialists, prescribed plaintiff pain medication, and
provided accommodations as necessary.  There is no evidence that plaintiff's medical needs were
ignored.  As set forth above, plaintiff's disagreement with defendants' assessment and treatment
of his medical complaints is insufficient to support a civil rights claim.

### ii. Defendants Andreasen, Bick and Walker

        In the operative complaint, plaintiff alleges that during the administrative appeal

1  process, defendants Andreasen, Bick, and Walker showed "wanton disregard and [were]

2  deliberately indifferent to plaintiff's serious medical needs by stating that plaintiff was or [had]

3  received adequate medical care for his medical problems[,] and that he "[had] received regular

4  and appropriate medical care for the issues raised in this appeal." (Dkt. No. 10 at 9.)

5          Defendants adduced evidence that defendant Bick was not in any way involved in

6  addressing plaintiff's administrative appeals.  Plaintiff cited no evidence to the contrary, and

7  appears not to dispute defendants' claim that defendant Bick is entitled to summary judgment.

8  (UDF 286, 287.)  Thus, defendant Bick is entitled to summary judgment on this claim.

9          Defendants adduced evidence that defendant Walker was not deliberately

10 indifferent to plaintiff's serious medical needs.  (UDF 230, 233-40, 342-47.)  Plaintiff submitted

11 no evidence to the contrary, and appears not to dispute defendants' claim that defendant Walker

12 is entitled to summary judgment on this claim.  (UDF 283-85.)  Accordingly, defendant Walker

13 is entitled to summary judgment on this claim.

14         Plaintiff's Eighth Amendment claim as to defendant Andreasen, based on his role

15 during the appeals process, also fails.  As noted in the undisputed facts, during the first level

16 review of plaintiff's appeals, Dr. Andreasen reviewed plaintiff's medical file, and appropriately

17 documented why he found plaintiff's medical care was appropriate.  (UDF 248-54; 310-27.)  As

18 set forth above, this court found plaintiff's treating doctors were not deliberately indifferent to

19 plaintiff's serious medical needs.  Plaintiff submitted no evidence to the contrary.[55]  Thus,

20 defendant Andreasen is also entitled to summary judgment.

21 ////

22 ////

23 ////

24

25    [55]  Plaintiff states that "the tone and statement of 'for your information' included at the
   second level of review for appeal Log #CMF-M-08-0983 is an example of deliberate
   indifference. (Dkt. No. 92-1 at 4.)  However, defendant Andreasen was not involved in the
26 second level of review.  (UDF 259, 335.)

1    IV.  Due Process Claim:  Defendants Andreasen, McKenzie, Bick, and Grannis[56]

2               In his fourth claim for relief, plaintiff asserts that defendants Andreasen,

3    McKenzie, Bick, and Grannis violated plaintiff's due process rights based on their role in

4    addressing plaintiff's administrative grievances.

5               Prisoners have no stand-alone due process rights related to the administrative

6    grievance process.  See Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988); see also Ramirez v.

7    Galaza, 334 F.3d 850, 860 (9th Cir.2003) (holding that there is no liberty interest entitling

8    inmates to a specific grievance process).  Because there is no right to any particular grievance

9    process, it is impossible for due process to have been violated by ignoring or failing to properly

10   process grievances.  Numerous district courts in this circuit have reached the same conclusion.

11   See Smith v. Calderon, 1999 WL 1051947 (N.D. Cal. 1999) (finding that failure to properly

12   process grievances did not violate any constitutional right); Cage v. Cambra, 1996 WL 506863

13   (N.D. Cal. 1996) (concluding that prison officials' failure to properly process and address

14   grievances does not support constitutional claim); James v. U.S. Marshal's Service, 1995 WL

15   295850 (N.D. Cal. 1995) (dismissing complaint without leave to amend because failure to

16   process a grievance did not implicate a protected liberty interest).

17              Therefore, defendants Andreasen, McKenzie, Bick, and Grannis are entitled to

18   summary judgment on plaintiff's due process claim.

19   V.  Qualified Immunity

20              Alternatively, defendants contend they are entitled to qualified immunity.

21   Because plaintiff's Eighth Amendment claims against defendants lack merit, the court need not

22   reach the defense of qualified immunity upon which defendants seek summary judgment as well.

23   Cf. Saucier v. Katz, 533 U.S. 194, 201 (2001) (discussing two parts of qualified immunity

24   analysis, including inquiry as to whether facts establish violation of constitutional right).

25

26        [56]  Because plaintiff does not dispute that defendant Bick was not involved in plaintiff's
administrative appeals (UDF 287), plaintiff's due process claim as to defendant Bick also fails.

VI.  Conclusion

        Accordingly, IT IS HEREBY RECOMMENDED that:

        1.  Defendants' June 22, 2012 motion for summary judgment (dkt. no. 80) be granted; and

        2.  This action be dismissed.

        These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  January 25, 2013

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

torr1222.msj